**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK**

IN THE MATTER OF THE SEARCH OF
INFORMATION ASSOCIATED WITH
SPECIFIED E-MAIL ACCOUNTS

Case No. 18-MJ-723
**SEALED FILING
REDACTED**

**MICROSOFT'S OBJECTIONS TO THE MAGISTRATE JUDGE'S ORDER DENYING
MICROSOFT'S MOTION TO MODIFY SECRECY ORDER**

**TABLE OF CONTENTS**

Page

INTRODUCTION ........................................................................................................................... 1

BACKGROUND ............................................................................................................................. 4

    A.    Following the Advent of Cloud Computing, the Government Claims New
        and Expansive Powers to Secretly Obtain the Data of Cloud Customers.............. 4

    B.    DOJ's Guidance and Policies Addressing Enterprise Customer Data and
        Section 2705(b) ...................................................................................................... 5

    C.    Microsoft's Cloud Services.................................................................................... 7

    D.    The Enterprise Customer ....................................................................................... 8

    E.    The Warrant and Secrecy Order ............................................................................ 9

    F.    Proceedings Before the Magistrate Judge ........................................................... 10

ARGUMENT................................................................................................................................. 12

I.    The Secrecy Order Is a Presumptively Unconstitutional Prior Restraint and a
    Content-Based Restriction That Is Subject to Strict Scrutiny........................................... 13

II.    The Government Has Failed to Establish That the Secrecy Order Is Narrowly
    Tailored. ............................................................................................................................ 15

    A.    Microsoft Has Proposed a Less Restrictive Alternative That Would
        Achieve the Government's Interests...................................................................... 15

    B.    The Magistrate Judge Erred in Concluding That the Government Met Its
        First Amendment Burden...................................................................................... 18

        1.    The Magistrate Judge Misapplied Strict Scrutiny in Allowing the
            Government to Carry Its Burden Based on an Absence of
            Information. ............................................................................................ 18

        2.    The Magistrate Judge Improperly Concluded That the First
            Amendment Requires a Less Restrictive Alternative That Perfectly
            Addresses the Government's Interest in Secrecy..................................... 20

        3.    The Magistrate Judge Relied on Unfounded Assumptions
            Regarding the Risks of Notification. ....................................................... 21

CONCLUSION.............................................................................................................................. 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aging Backwards, LLC v. Esmonde-White,*
　2016 WL 11523402 (S.D. Fla. Sept. 26, 2016) .......................................................................24

*Al Haramain Islamic Found, Inc. v. U.S. Dep't of Treasury,*
　686 F.3d 965 (9th Cir. 2012) ..................................................................................................25

*ALCOA v. EPA,*
　663 F.2d 499 (4th Cir. 1981) ..................................................................................................13

*Alexander v. United States,*
　509 U.S. 544 (1993).................................................................................................................13

*Ashcroft v. ACLU,*
　542 U.S. 656 (2004).................................................................................................................20

*Carpenter v. United States,*
　138 S. Ct. 2206 (2018)...............................................................................................................4

*Deegan v. City of Ithaca,*
　444 F.3d 135 (2d Cir. 2006).....................................................................................................19

*Denver Area Educ. Telecomm. Consortium, Inc. v. FCC,*
　518 U.S. 727 (1996).................................................................................................................20

*Eli Lilly & Co. v. Gottstein,*
　617 F.3d 186 (2d Cir. 2010).....................................................................................................22

*First Nat'l Bank of Bos. v. Bellotti,*
　435 U.S. 765 (1978).................................................................................................................24

*Green Party of Conn. v. Garfield,*
　616 F.3d 189 (2d Cir. 2010).....................................................................................................17

*In re Terrorist Bombings of U.S. Embassies in E. Africa,*
　552 F. 3d 93 (2d Cir. 2008)......................................................................................................24

*Landmark Communications, Inc. v. Virginia,*
　435 U.S. 829 (1978).................................................................................................................19

*Microsoft Corp. v. U.S. Dep't of Justice,*
　233 F. Supp. 3d 887, 906 (W.D. Wash. 2017)................................................................*passim*

*Nebraska Press Ass'n v. Stuart,*
   427 U.S. 539 (1976).............................................................................................................2, 14, 25

*Rajaratnam v. Moyer,*
   47 F.3d 922 (7th Cir. 1995) .............................................................................................13

*Reed v. Town of Gilbert, Ariz.,*
   135 S. Ct. 2218 (2015).........................................................................................12, 14, 15, 19

*Rhodes v. Pfeiffer,*
   2017 WL 11048475 (C.D. Cal. Sept. 12, 2017) .......................................................................24

*Riley v. California,*
   573 U.S. 373 (2014)...........................................................................................................19

*SEC v. Homa,*
   514 F.3d 661 (7th Cir. 2008) ..............................................................................................22

*United States v. D'Amico,*
   734 F. Supp. 2d 321 (S.D.N.Y. 2010)...................................................................................21

*United States v. Keppel Offshore & Marine Ltd,*
   17-CR-697 (E.D.N.Y. Dec. 22, 2017), https://perma.cc/PG86-ZPX3....................................22

*United States v. Playboy Entm't Grp.,*
   529 U.S. 803 (2000)...................................................................................................... *passim*

*United States v. Quattrone,*
   402 F.3d 304 (2d Cir. 2005)............................................................................................13, 14

*United States v. Warshay,*
   1998 WL 767138 (E.D.N.Y. Aug. 4, 1998)............................................................................13

*United States v. Zemlyansky,*
   945 F. Supp. 2d 438 (S.D.N.Y. 2013)...................................................................................21

*Video Software Dealers Ass'n v. Schwarzenegger,*
   556 F.3d 950 (9th Cir. 2009) ..............................................................................................20

*Wilson v. Arkansas,*
   514 U.S. 927 (1995)...........................................................................................................14

**Statutes**

18 U.S.C. § 2705(b) ...................................................................................................... *passim*

18 U.S.C. § 3103a(b)(3)..........................................................................................................5

28 U.S.C. § 636(b) ...................................................................................................................13

18 U.S.C. § 2703 ............................................................................................................2

**Constitutional Amendments**

First Amendment ......................................................................................................... *passim*

Fourth Amendment ........................................................................................... 4, 14, 21

**Legislative Authority**

H.R. Rep. No. 99-647 (1986) .........................................................................................5

**Other Authorities**

ABA Model Rules of Professional Conduct, https://perma.cc/BTN3-F39W,
https://perma.cc/CP4N-LVLU ...................................................................................24

U.S. Attorney's Manual, § 9-28.800, https://perma.cc/P3A6-98CQ ...............................22

U.S. Dep't of Justice, Policy Regarding Applications for Protective Orders
Pursuant to 18 U.S.C. § 2705(b) (Oct. 19, 2017),
https://perma.cc/E9KY-D2RY ...............................................................................5, 17

U.S. Dep't of Justice, Seeking Enterprise Data Held by Cloud Service Providers
(Dec. 2017), https://perma.cc/545N-9FJL ..............................................................*passim*

## INTRODUCTION

This case involves an order that bars Microsoft from notifying *anyone* that it has received a search warrant demanding the emails of two low-level employees in one business unit of a multinational, publicly listed Microsoft customer. The Government filed its application for the secrecy order under seal, presented it to the Court *ex parte*, and never shared it with Microsoft. But the unrefuted facts available to Microsoft show the Government cannot justify such a total ban on Microsoft's speech. Microsoft could notify a range of individuals at its corporate customer, ▋▋▋▋, without compromising the Government's investigation. The customer has a mature governance and compliance structure and thousands of employees, including about ▋▋▋ in the United States. Its U.S.-based personnel include senior lawyers (such as its general counsel for the Americas), executives (including its regional president for North America), and an outside director, all of whom are far removed from the one foreign business unit implicated by the warrant. Nothing suggests that notifying any of these individuals would tip off the two employees whose emails are at issue.

Consistent with its commitment to customers to challenge overbroad secrecy orders, Microsoft asked the Court to permit notice to at least one appropriate individual at ▋▋▋▋. The Government opposed Microsoft's motion and rejected its offer to discuss possible candidates for notification or alternatives to blanket secrecy. The Magistrate Judge denied Microsoft's motion, and these objections followed.

The Government's insistence on secrecy manifests a new and disturbing approach to corporate investigations. Twenty years ago, if the Government wanted a company's emails, it needed to go to the company: It could execute a search warrant on the company's premises and physically seize its email server, or it could serve a subpoena. Either way, the company would

know what was happening, allowing it (among other things) to retain counsel, assert applicable privileges, and seek the return of its seized records.

If the Government has its way here, that will change. Businesses today store their emails in the "cloud"—remote servers maintained by technology providers like Microsoft. Armed with a statute passed well before the modern Internet—the Electronic Communications Privacy Act ("ECPA"), 18 U.S.C. § 2703—the Government now may obtain those companies' private emails and confidential documents directly from cloud service providers. And the Government claims it can do this secretly, using orders authorized by ECPA that bar providers from telling anyone—even their customers—that the Government has obtained their records. *Id.* § 2705(b). The Government thus insists it can seize sensitive information without the business even knowing of the seizure until long after the fact, when the order expires or the Government brings charges.

The First Amendment does not give the Government such a blank check for secrecy. Section 2705(b) orders are prior restraints and content-based restrictions aimed at the type of speech at the heart of the First Amendment's protections—speech about government affairs. They are therefore presumptively unconstitutional, *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 558 (1976), and must satisfy strict scrutiny, *see, e.g.*, *Microsoft Corp. v. U.S. Dep't of Justice*, 233 F. Supp. 3d 887, 906 (W.D. Wash. 2017). They must be narrowly tailored to promote a compelling government interest and must be the least restrictive means of achieving that interest. *United States v. Playboy Entm't Grp.*, 529 U.S. 803, 813 (2000). "When a plausible, less restrictive alternative is offered to a content-based restriction, it is the Government's obligation to prove that the alternative will be ineffective to achieve its goals." *Id.* at 816.

The Department of Justice ("DOJ") itself recognizes the Government normally has a less restrictive alternative to a total ban on speech in these situations. In 2017, DOJ issued

2

recommended practices guiding prosecutors to generally "seek data directly from the enterprise, rather than its cloud-storage provider," or at least permit the provider to tell its customer about the demand. Dkt. 15, Ex. 1 at 1 (U.S. Dep't of Justice, Seeking Enterprise Data Held by Cloud Service Providers (Dec. 2017), https://perma.cc/545N-9FJL) ("DOJ Recommended Practices"). DOJ recognized that notice could compromise an investigation "if [the] enterprise is essentially devoted to criminal activity—for example, a small medical practice suspected of engaging in massive Medicare fraud." *Id.* at 2. In the typical case, however, at least one "trustworthy individual" at the enterprise can safely be informed. *Id.* Here, the record shows ███████ must have many "trustworthy" individuals.

In denying Microsoft's motion, the Magistrate Judge identified the correct First Amendment standard (strict scrutiny), but misapplied it in three ways by (i) concluding the Government could satisfy the standard based on an "absence of . . . information" about whether Microsoft's proposal to notify an individual would be workable; (ii) concluding Microsoft's less-restrictive alternatives were ineffective because they might not perfectly address the Government's interests; and (iii) relying on incorrect assumptions regarding the risks of notification. Dkt. 35 ("Order") at 10-11. In effect, the Magistrate Judge applied strict scrutiny in name only and, in fact, improperly relieved the Government of its heavy burden to justify this prior restraint. If, as the Magistrate Judge held, the Government can completely silence a provider by pointing to an absence of information and a speculative risk of disclosure, the Government may restrain speech in every digital investigation, and the First Amendment's exacting requirement of narrow tailoring means nothing. That is not the law. The secrecy order should be modified.

3

## BACKGROUND

**A.     Following the Advent of Cloud Computing, the Government Claims New and Expansive Powers to Secretly Obtain the Data of Cloud Customers**

Cloud computing has fundamentally changed how companies store information. Twenty years ago, companies typically stored their emails and other electronic data on their physical property. Today, companies increasingly store their sensitive communications, documents, and information in the "cloud"—*i.e.*, on remote servers owned by companies like Microsoft. This migration "reduce[s] information technology infrastructure costs, increase[s] resiliency, and improve[s] data availability for mobile workers." DOJ Recommended Practices at 1.

With this migration, prosecutors have claimed new powers to obtain cloud customers' data. "Prior to the advent of widespread cloud services, prosecutors had to approach a company or similar enterprise directly for electronic data stored on servers located on an enterprise's premises." *Id.* "Since the advent of cloud computing, however, prosecutors have the legal authority to compel the enterprise *or a cloud service provider* to produce the data." *Id.* (emphasis added). In other words, cloud computing has made it possible for the Government to seize and search private records not from the business itself, but from its cloud provider.[1]

Further, the Government asserts the power to carry out these seizures in secret. Under 18 U.S.C. § 2705(b), courts may prohibit providers from notifying "any other person" of the existence of a warrant, subpoena, or other court order if the court finds that notification "will result in" one of five adverse events: (1) endangering the life or physical safety of an individual;

---

[1]     This technological shift also has Fourth Amendment implications for the business whose documents are the subject of the Government's demand. The Supreme Court has explained that "the modern-day equivalents of an individual's own 'papers' or 'effects,'" such as documents stored in the cloud, "should receive full Fourth Amendment protection." *Carpenter v. United States*, 138 S. Ct. 2206, 2222 (2018) (quotations omitted); *see also id.* at 2269 ("Just because you entrust your data—in some cases, your modern-day papers and effects—to a third party may not mean you lose any Fourth Amendment interest in its contents.") (Gorsuch, J., dissenting).

(2) flight from prosecution; (3) destruction of or tampering with evidence; (4) intimidation of potential witnesses; or (5) otherwise seriously jeopardizing an investigation or unduly delaying a trial. Congress enacted Section 2705(b) in 1986 as part of ECPA, when the Internet was still in its infancy. *See, e.g.*, H.R. Rep. No. 99-647, at 21-23 (1986) (positing that email *might* replace paper letters). At that time, if the Government wanted to obtain a company's private papers from a filing cabinet or emails from an on-premises computer, the Government could execute a search warrant, which by its nature would notify the target. Or the Government could issue a subpoena to the company directly. Either way, the company would know about the Government's actions.[2] With the migration of enterprise data to the cloud, however, Section 2705(b) has handed the Government a significant and unprecedented power: the ability to obtain a company's information *without the company's knowledge*.

**B.    DOJ's Own Guidance and Policies Recognize That the Government Must Use Its Secrecy Power Sparingly**

In 2016, Microsoft challenged the constitutionality of Section 2705(b). *See Microsoft Corp.*, 233 F. Supp. 3d at 906. After the district court denied DOJ's motion to dismiss, DOJ issued a binding policy limiting the circumstances in which federal prosecutors may seek secrecy orders. *See* U.S. Dep't of Justice, Policy Regarding Applications for Protective Orders Pursuant to 18 U.S.C. § 2705(b), at 1 (Oct. 19, 2017), https://perma.cc/E9KY-D2RY ("DOJ Policy"). Among other things, the policy addresses the First Amendment deficiencies identified in the litigation, recognizing that notification of the person whose information is obtained must be the

---

[2]    Even in the narrow context of so-called "sneak and peek" warrants, which permit surreptitious physical searches, the Government must notify the target "within a reasonable period not to exceed 30 days," absent case-specific facts justifying a longer period. 18 U.S.C. § 3103a(b)(3). Because such surreptitious searches are so exceptional, the sneak and peek statute requires courts to report detailed information about all sneak and peek warrants to the Administrative Office of the United States Courts, which reports annually to Congress on the use of this tool. *Id.* § 3103a(d).

rule—and preventing a provider from notifying its customer the exception. *Id.* at 1. The policy directs prosecutors to obtain Section 2705(b) orders only after an "individualized and meaningful assessment regarding the need" for such an order, and requires that each application for a secrecy order be "tailor[ed] . . . to include the available facts of the specific case and/or concerns attendant to the particular type of investigation." *Id.* at 2. The DOJ Policy thus requires actual facts to justify a secrecy order—not mere speculation.

Two months later, DOJ recognized the "unique challenges" associated with obtaining enterprise customer data from a cloud service provider, rather than the enterprise itself, and issued "recommended practices" for seeking such data. DOJ Recommended Practices at 1. The DOJ Recommended Practices acknowledge that without an opportunity to know their information has been seized, companies cannot "interpose privilege and other objections to disclosure." *Id.* at 2. The DOJ Recommended Practices also acknowledge practical challenges—both for the provider and for law enforcement—that may make it more efficient for law enforcement to obtain information directly from the customer. *Id.* at 1-2. Consequently, DOJ recommends that "prosecutors should seek data directly from the enterprise, rather than its cloud-storage provider, if doing so will not compromise the investigation." *Id.* at 1.

The DOJ Recommended Practices identify several factors that prosecutors should weigh in deciding whether directly approaching an enterprise will compromise an investigation. "If an investigation requires only a subset of data—for example, the email accounts of a small group of employees . . . approaching the enterprise will often be the best way to get the information or data sought." *Id.* at 2. "In those cases, identifying an individual within the enterprise who is an appropriate contact for securing the data is often the first step. In many enterprises, this will be the general counsel or legal representative." *Id.* "Working with counsel and the enterprise's

6

information technology staff, law enforcement can identify and seek disclosure of relevant information. This approach also gives the counsel the opportunity to interpose privilege and other objections to disclosure for appropriate resolution, and parallels the approach that would be employed if the enterprise maintained data on its own servers, rather than in the cloud." *Id.*

In other cases, the DOJ Recommended Practices explain, prosecutors "have justified reasons for not approaching the enterprise directly, at least initially. If an enterprise is essentially devoted to criminal activity—for example, a small medical practice suspected of engaging in massive Medicare fraud—there may not be a trustworthy individual to approach." *Id.* In these cases, "seeking disclosure directly from the cloud provider may be the only practical option." *Id.* at 2-3.

### C.   Microsoft's Cloud Services

Microsoft provides cloud-based services, including Office 365, which provide email accounts and productivity software to a wide range of enterprise customers. When an enterprise customer signs up for Office 365, it purchases a specified number of end-user licenses, or "seats," each assigned to a user who receives account credentials and an individual email address. Addresses hosted by Office 365 incorporate the enterprise customer's chosen domain name (*e.g.*, jane.smith@company.com, rather than jane.smith@outlook.com).

Microsoft maintains industry-leading privacy policies and devotes substantial resources to protecting its customers' privacy. These policies are rooted in Microsoft's belief that an enterprise customer's data belongs to the customer, not to Microsoft. For that reason, and consistent with the DOJ Recommended Practices, when law enforcement demands enterprise customer data directly from Microsoft, Microsoft ordinarily asks the Government to redirect its

request to the enterprise customer itself. In addition, before Microsoft complies with such a demand, it generally notifies the customer, unless Microsoft receives a secrecy order.

Microsoft intends these practices to allow its enterprise customers to maintain the same level of control and privacy over their cloud-based information as when they store that information on premises. In addition, Microsoft's redirection policy reflects the practical reality that, because of Office 365's design, the enterprise customer is generally better positioned than Microsoft to collect and produce its own data. *See* DOJ Recommended Practices at 1-2.

### D. The Enterprise Customer

The enterprise customer in this case is ▆▆▆▆▆ (the "Customer"), a publicly traded global conglomerate that provides ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ ▆▆▆▆▆▆▆▆▆▆▆▆▆▆.[3] Headquartered in ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ is divided into ▆▆▆▆ geographic regions that span ▆▆ continents and over ▆▆ countries, with each region responsible for its own sales, service execution, and order handling.[4] The company has ▆▆▆ offices in the United States, part of its North American region.[5] Overall, ▆▆▆▆▆▆ employs more than ▆▆▆▆ people, including approximately ▆▆▆ employees in the United States.[6]

Since its founding in ▆▆▆▆, ▆▆▆▆▆▆▆ has acquired at least ▆▆▆ businesses, which it has incorporated as individual product brands.[7] Those brands include ▆▆▆▆▆▆, which







As of August 20, 2018, ▮▮▮▮ had assigned almost ▮▮▮ Office 365 seats to its employees, providing each a unique email address. The company also had designated ▮▮ "administrator accounts," which have administrative rights to all user accounts, including the right to collect and produce information stored in those accounts, including emails, without notifying the user.

E.    **The Warrant and Secrecy Order**

On August 6, 2018, the Government served Microsoft with a warrant demanding several categories of information for two email accounts used by two ▮▮▮▮▮ employees. Dkt. 2. The warrant was accompanied by a secrecy order stating that:

> The Court determines that there is reason to believe that notification of the existence of the attached warrant will seriously jeopardize the investigation or unduly delay a trial, including by giving targets an opportunity to flee or continue flight from prosecution, destroy or tamper with evidence, change patterns of behavior, and intimidate potential witnesses.
>
> IT IS THEREFORE ORDERED under 18 U.S.C. § 2705(b) that Microsoft Corporation shall not disclose the existence of the attached warrant, or this Order of the Court, to the listed subscriber or to any other person, for the period of one year from the date of this Order, except that Microsoft Corporation may disclose the attached warrant to an attorney for Microsoft Corporation for the purposes of receiving legal advice.

Dkt. 3 (citation omitted).

---

8  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

### F.    Proceedings Before the Magistrate Judge

On September 5, 2018, Microsoft filed a motion to modify the secrecy order to allow it to

notify an appropriate individual at the Customer about the warrant.[9]  Microsoft argued that the

order imposes a prior restraint and a content-based restriction under the First Amendment and

therefore must satisfy strict scrutiny. Dkt. 14. Microsoft explained that the order fails strict

scrutiny because the Government has not proven that the less restrictive alternative that

Microsoft proposed—notification of *any* appropriate individual among the more than ████

employed by the Customer—does not achieve its interests. *Id.*

Microsoft did "not assert a unilateral right to choose the appropriate individual at the

customer to notify," but stressed that it "stands ready to work with the Government to identify

the most appropriate candidate for notification." Dkt. 24 at 5 (quotations and citations omitted).

"[G]iven the size of the Enterprise Customer, it is implausible that there is no such appropriate

individual—such as the CEO, CFO, General Counsel, Chief Information Officer (CIO), CISO, or

members of the Board of Directors—to whom disclosure could be made." *Id.*  Finally, Microsoft

argued that if the Government wanted further comfort, the Magistrate Judge could condition

Microsoft's disclosure of the details of the warrant on the Customer's willingness to limit further

disclosure to specified persons within the company, each of whom would be required to commit

to maintain the confidentiality of the information received. *Id.* at 7.

In opposing the motion, the Government did not address the appropriateness of any of the

specific candidates for notification Microsoft identified. Instead, the Government argued

---

[9]     Microsoft also filed a motion stay its obligation to comply with the search warrant until
its motion to modify was resolved. Dkt. 16. The Magistrate Judge denied Microsoft's stay
motion without explanation on October 16, 2018, Dkt. 31, and Microsoft produced the account
data responsive to the warrant.

primarily that it lacked sufficient information to assess whether these or any other individuals could be notified, and that the Government should not be required to "gamble" with its investigation. Dkt. 23 ("Gov't Opp'n") at 1.

On July 31, 2019, the Magistrate Judge denied Microsoft's motion to modify. She first explained that a non-disclosure order under Section 2705(b) "imposes a speech restriction which courts have generally construed as a content-based prior restraint." Order at 6. "Given the uniformity in how other courts have analyzed" Section 2705(b) secrecy orders, she concluded the secrecy order at issue is a prior restraint and content-based restriction on speech, and thus subject to strict scrutiny. *Id.* at 8. The Magistrate Judge further explained that, "[i]n order to satisfy strict scrutiny, the Government must demonstrate that the restriction of non-disclosure is narrowly tailored to promote a compelling Government interest and that there are no less restrictive alternatives to achieve the Government's purpose." *Id.* (quotations omitted).

The Magistrate Judge then concluded that the Government had met its burden, finding that the Government had demonstrated a compelling interest in "safeguarding the integrity of its ongoing investigation" and that Microsoft's proposed less restrictive alternative would not "serve the Government's purpose as effectively as the [order] now stands." Order at 9-10. The Magistrate Judge accepted the Government's contention that "it does not know exactly who else at the Customer was aware of or may be involved in the illegal activities," and that "[i]n the absence of this information, disclosing the Search Warrant to anyone in the Customer"—out of its thousands of employees—"will jeopardize the investigation and leave the Government 'with no assurance of the secrecy of its investigation.'" *Id.* at 10 (quoting Gov't Opp'n).

The Magistrate Judge added that although "Microsoft suggests that measures could be taken to ensure that any point of contact within the Customer maintains the secrecy of the Search

11

Warrant," those measures would not be effective for two reasons. *Id.* at 11. First, the Magistrate Judge observed that the parent company and the targeted business unit are headquartered outside the United States, "potentially placing them outside the contempt jurisdiction of the Court." *Id.* Second, the Magistrate Judge reasoned that "the General Counsel [of the Customer] would have a professional duty to advise its client of the Search Warrant, thus making it impossible to maintain secrecy." *Id.* In light of these "particular circumstances," the Magistrate Judge concluded that notifying anyone at the Customer would not be effective in achieving the Government's interest in protecting the secrecy of its investigation. *Id.* at 11-12.[10]

## ARGUMENT

As the Magistrate Judge correctly concluded, the secrecy order is a prior restraint and content-based restriction on Microsoft's speech. Accordingly, it is "presumptively unconstitutional" and may be sustained "only if the Government proves that [it is] narrowly tailored to serve compelling state interests." *Reed v. Town of Gilbert, Ariz.*, 135 S. Ct. 2218, 2226 (2015). If a less restrictive alternative would accomplish the Government's purpose, the Government must use that alternative. *Playboy*, 529 U.S. at 813.

Here, the Government has not established that Microsoft's proposed less-restrictive alternative—notification of an appropriate officer, director, or employee of the Customer—will be ineffective to achieve its goal of maintaining the secrecy of its investigation. Nevertheless,

---

[10]     The secrecy order at issue in the Magistrate Judge's decision expired by its terms on August 3, 2019. Two days earlier, on August 1, 2019, the Government obtained a renewed secrecy order, which Microsoft sought to modify by motion dated September 5, 2019 ("renewed Motion"). The legal and factual issues in Microsoft's renewed Motion are the same as those in Microsoft's objections. By stipulation dated September 9, 2019, the parties agreed that Microsoft's renewed Motion should be transferred to the district court randomly assigned to consider these objections. Microsoft respectfully submits that the renewed secrecy order should be modified for the same reasons as those set out in these objections and in Microsoft's renewed Motion.

12

the Magistrate Judge allowed the Government to justify its restraint with mere "uncertainty"
regarding the potential harms from disclosure, thereby relieving the Government of its burden of
proof and requiring Microsoft to *disprove* the Government's speculation that Microsoft's
proposal is infeasible.  The Magistrate Judge accordingly erred in denying Microsoft's motion,
and this Court should modify the secrecy order to permit notification to an appropriate individual
at the Customer.[11]

## I.       The Secrecy Order Is a Presumptively Unconstitutional Prior Restraint and a Content-Based Restriction That Is Subject to Strict Scrutiny.

As courts have "almost uniformly" concluded, and as the Magistrate Judge correctly held,
secrecy orders issued pursuant to Section 2705(b) are prior restraints and content-based
restrictions under the First Amendment. *Matter of Search Warrant for [redacted].com*, 248 F.
Supp. 3d 970, 980 (C.D. Cal. 2017) (collecting cases); *see also* Order at 8.

A prior restraint is a judicial order "forbidding certain communications when issued in
advance of the time that such communications are to occur." *Alexander v. United States*, 509
U.S. 544, 550 (1993) (emphasis and quotations omitted).  "It has long been established that such
restraints constitute the most serious and the least tolerable infringement on our freedoms of
speech and press." *United States v. Quattrone*, 402 F.3d 304, 309 (2d Cir. 2005) (quotations
omitted).  Any prior restraint thus bears "a heavy presumption against its constitutional validity,"

---

[11]       This Court reviews the Magistrate Judge's decision *de novo*.  The Magistrate Judge's
jurisdiction arose from the "catch-all provision" in 28 U.S.C. § 636(b)(3).  This provision
prescribes no standard of review, but "courts have borrowed . . . the dispositive-nondispositive
distinction . . . of subsection (b)(1)." *United States v. Warshay*, 1998 WL 767138, at *3
(E.D.N.Y. Aug. 4, 1998); *see also Rajaratnam v. Moyer*, 47 F.3d 922, 924 n.8 (7th Cir. 1995).
Under subsection (b)(1), a district court reviews *de novo* the dispositive ruling of a magistrate
judge.  28 U.S.C. § 636(b)(1)(B)-(C).  The Magistrate Judge's decision here is dispositive
because it resolved a motion "set[ting] forth all of the relief requested" by Microsoft.  *ALCOA v.
EPA*, 663 F.2d 499, 501 (4th Cir. 1981).

13

and the Government "carries a heavy burden of showing justification for the imposition of such a restraint." *Nebraska Press Ass'n*, 427 U.S. at 558 (quotations omitted).

Content-based restrictions on speech are also "presumptively unconstitutional." *Reed*, 135 S. Ct. at 2227. "Government regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed." *Id.* As with prior restraints, content-based restrictions are subject to strict scrutiny. As the Supreme Court has instructed, "[i]t is rare that a regulation restricting speech because of its content will ever be permissible." *Playboy*, 529 U.S. at 813.

Here, the secrecy order prohibits Microsoft from "disclos[ing] the existence" of both the search warrant and the order itself to the Customer "or to any other person." Dkt. 3 at 1. As the Magistrate Judge correctly concluded, Order at 8, this restriction is a presumptively invalid prior restraint, as it "suppresses speech . . . on the basis of the speech's content and in advance of its actual expression." *Quattrone*, 402 F.3d at 309. As such, the secrecy order is analogous to an injunction preventing speech from taking place before it occurs. *See Microsoft*, 233 F. Supp. 3d at 906 (holding that secrecy orders issued under Section 2705(b) are prior restraints).[12]

The Magistrate Judge also correctly concluded that the secrecy order is a content-based restriction on Microsoft's speech. *See* Order at 8. By singling out and suppressing speech about the contents or existence of the secrecy order and the search warrant, the order "targets speech based on its communicative content" and restricts speech based on its "function or purpose."

---

[12]     Secrecy orders accompanying warrants are doubly problematic under the Constitution, because they restrain not only Microsoft's First Amendment rights, but also undermine the Fourth Amendment rights of customers to be notified by the Government when it searches and seizes property. *See Wilson v. Arkansas*, 514 U.S. 927, 934 (1995) (reasonableness of Fourth Amendment search and seizure may depend on whether prior notice is provided to the target).

14

*Reed*, 135 S. Ct. at 2226-27. Accordingly, for this independent reason, the order is presumptively invalid under the First Amendment. *See Playboy*, 529 U.S. at 817.

## II. The Government Has Failed to Establish That the Secrecy Order Is Narrowly Tailored.

### A. Microsoft Has Proposed a Less Restrictive Alternative That Would Achieve the Government's Interests.

By asking that Microsoft be permitted to notify an appropriate individual at the Customer, Microsoft has proposed an alternative that is less restrictive than the Government's total ban on speech. Because Microsoft's First Amendment rights were restricted in an *ex parte* proceeding in which it was not permitted to participate, Microsoft has less information than the Government about the underlying investigation. Even so, it is facially implausible that in a company with more than ▇▇ employees—including ▇▇▇ employees in the United States—not a *single* appropriate individual could be notified without compromising the investigation.

The Government does *not* claim this case involves an "enterprise . . . essentially devoted to criminal activity," such as "a small medical practice suspected of engaging in massive Medicare fraud." DOJ Recommended Practices at 2. Nor has there been any suggestion that the Customer's senior leadership in ▇▇▇▇—or *any* of the company's ▇▇▇ employees in the United States—is involved in any misconduct. Rather, the warrant targets two employees at ▇▇▇▇▇▇, one of the Customer's ▇▇▇▇▇▇▇▇▇▇▇ with offices in ▇▇▇▇▇▇▇ ▇▇▇▇. *See supra* at 9. These employees apparently "used their work emails to communicate with senior employees of *another company* about committing illegal activity." Order at 10 (emphasis added).

The Government has shared no information even suggesting—let alone establishing— that the evidence on which it bases its claimed need for secrecy extends within the company beyond these two low-level employees in a single discrete business unit. In these circumstances,

15

there must be a range of candidates who plausibly could be notified without jeopardizing the

Government's investigation.  For example, ▮▮▮▮▮▮ executive management team,

including its CEO, CFO, and head of legal affairs, is based in ▮▮▮▮—geographically and

organizationally far removed from the employees whose email accounts are targeted.[13]

▮▮▮▮ also has several officers and senior counsel based in the United States, including ▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮,[14]  Another American, ▮▮▮▮▮▮

▮▮▮, serves as an outside director on ▮▮▮▮ Board. ▮▮▮▮ is also Senior Vice

President and General Manager at ▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮, that is traded on the New York Stock Exchange.[15]

Further, ▮▮▮ has a robust compliance function for handling internal misconduct.

As a company listed on the ▮▮▮▮▮▮▮ is bound by numerous

auditing and compliance obligations, including exacting requirements for the handling of



---

13 ▮▮▮▮▮▮▮▮▮▮▮▮▮

14 ▮▮▮▮▮▮▮▮▮▮▮ Another senior executive

based in the United States is ▮▮▮▮▮▮

In addition to ▮▮▮▮, General

Counsel for the Americas, numerous    employees appear to be admitted to the bar in the

United States, including ▮

▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮

As their bar admissions show,

several of these lawyers appear to have decades of experience.

15 ▮▮▮▮▮▮▮▮▮▮

confidential information.[16] ▮▮▮▮▮ compliance team reports directly to the Audit

Committee of the Board and maintains a whistleblower hotline, overseen by the ▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮[17] Given these policies and

controls, it is particularly implausible that notifying ▮▮▮▮▮▮▮▮▮▮▮ would

undermine "the Government's purpose" in protecting its investigation. *See Green Party of

Conn. v. Garfield*, 616 F.3d 189, 209 (2d Cir. 2010).

The Government has never explained why these candidates for notification would be

likely to violate corporate policy, compromise the integrity of the Government's investigation,

and potentially subject the Customer to liability in the process. Instead, the Government relies

on *ipse dixit* that corporate employees indiscriminately share even confidential information

because this is "the way corporations work." Oral Argument Tr. at 25:15-16. This type of

generalized supposition falls far short of the "individualized and meaningful assessment" needed

to justify secrecy. DOJ Policy at 1.

Nor has the Government been willing to meet and confer with Microsoft to discuss other

possible candidates for notification—or other approaches short of a total ban on speech. For

example, Microsoft proposed that the Court could condition disclosure of the details of the

warrant on the Customer's willingness to limit disclosure to specified persons, each of whom

would commit to maintain the confidentiality of the information received. At a minimum, the

16 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

17 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Court could permit disclosure *of the mere fact that Microsoft has received a warrant for the Customer's information*, without going so far to allow Microsoft to disclose the specific email accounts targeted. This approach could not plausibly lead to the specific users targeted by the warrant being notified, while at the same time would allow the Customer to raise any concerns (or a request for more information) directly with the Government or the Court.

Each of these alternatives is less speech-restrictive than the Government's total ban on speech. And while Microsoft cannot address evidence it cannot see, nothing in the record indicates that the Government has "prove[n] that the[se] alternative[s] will be ineffective to achieve its goals." *Playboy*, 529 U.S. at 816. The secrecy order should accordingly be modified.

**B.     The Magistrate Judge Erred in Concluding That the Government Met Its First Amendment Burden.**

In concluding that the Government met its burden to show that the secrecy order is narrowly tailored, the Magistrate Judge misapplied strict scrutiny in three respects, by: (1) crediting the Government's speculation that Microsoft's proposed alternative is infeasible; (2) concluding that Microsoft's less-restrictive alternative was ineffective simply because it might not perfectly address the Government's interests; and (3) relying on unfounded assumptions regarding the risks of notifying an appropriate individual at the Customer.

1.     The Magistrate Judge Misapplied Strict Scrutiny in Allowing the Government to Carry Its Burden Based on an Absence of Information.

Despite the Government's failure to refute Microsoft's proposed alternatives, the Magistrate Judge held the secrecy order's blanket ban on Microsoft's speech was justified because of the Government's "*uncertainty* at this stage of the investigation as to who can be trusted with knowledge of the Search Warrant." Order at 11 (emphasis added). The Magistrate Judge reasoned that in the "*absence* of this information," the "*possibility* that high-level employees at the Customer knew of or condoned [illegal] activity" was enough to render

18

Microsoft's proposed alternatives unworkable. *Id.* at 10 (emphasis added); *see also id.* at 11 (identifying a "*potential*[]" concern with Microsoft's proffered alternative) (emphasis added)).

This reverses the well-settled burden of proof. "In a First Amendment challenge, the *government* bears the burden of showing that its restriction of speech is justified." *Deegan v. City of Ithaca*, 444 F.3d 135, 142 (2d Cir. 2006) (emphasis added). By allowing the Government to satisfy its burden with mere "uncertainty" and the "absence of . . . information," the Magistrate Judge improperly relieved the Government of its First Amendment burden and required Microsoft to *disprove* the Government's concerns. Worse yet, the Government has articulated those concerns in an *ex parte* application that Microsoft has never seen, making it impossible for Microsoft to meet the burden it should never bear in the first place.

Strict scrutiny demands more than "possibilities" and "potentials"; overcoming the presumption of unconstitutionality requires the Government to offer *proof* that the proposed less restrictive alternative is unworkable. "[T]he Government must present more than anecdote and supposition." *Playboy*, 529 U.S. at 822; *see also Landmark Communications, Inc. v. Virginia*, 435 U.S. 829 (1978) (concluding the Government had not met its burden where it "offered little more than assertion and conjecture to support its claim"). If the Government's simple assertion of uncertainty about hypothetical risks to its investigation were sufficient to satisfy strict scrutiny, the Government could *always* plead ignorance and restrict speech in its discretion. Secrecy orders would flip from being "presumptively unconstitutional," *Reed*, 135 S. Ct. at 2226, to being automatically constitutional. "[T]he Founders did not fight a revolution to gain the right" to such meager protection. *Riley v. California*, 573 U.S. 373, 398 (2014).

2. The Magistrate Judge Improperly Concluded That the First Amendment Requires a Less Restrictive Alternative That Perfectly Addresses the Government's Interest in Secrecy.

The Magistrate Judge also assumed that Microsoft's proffered alternatives must give the Government a risk-free "assurance of the secrecy of its investigation." Order at 10. The law imposes no such burden on Microsoft. A less speech-restrictive alternative will *never* be as perfect in furthering the Government's interest in secrecy as a total ban on speech—because pure secrecy *always* makes the Government's job easier—and the First Amendment does not require a "perfect solution." *Ashcroft v. ACLU*, 542 U.S. 656, 668 (2004) (striking down speech ban even though the less restrictive alternative, filtering software, was not "a perfect solution" and "may block some materials that are not harmful to minors and fail to catch some that are").

In *Playboy*, for example, the Supreme Court considered a First Amendment challenge to a statute requiring cable television operators to block or limit adult programming to late night. 529 U.S. at 806. The Court struck down the restriction because it identified a less speech-restrictive means to achieve the Government's interest in protecting children: household-by-household blocking implemented by parents. *Id.* at 816. The Court reached this conclusion even though "voluntary blocking requires a consumer to take action, or may be inconvenient, or may not go perfectly every time." *Id.* at 824; *see also Denver Area Educ. Telecomm. Consortium, Inc. v. FCC*, 518 U.S. 727, 759 (1996) ("No provision . . . short of an absolute ban, can offer certain protection against assault by a determined child. We have not, however, generally allowed this fact alone to justify reducing the adult population to only what is fit for children." (alterations and quotations omitted)).

To survive strict scrutiny, in other words, the Government is not free to simply adopt the "*most* effective" way to further its goals; it must instead adopt the "least restrictive means" of doing so. *Video Software Dealers Ass'n v. Schwarzenegger*, 556 F.3d 950, 965 (9th Cir. 2009)

(emphasis added). For that reason, even if Microsoft's proffered alternatives do not provide the Government perfect "assurance" (a proposition the Government has not remotely proven), the secrecy order must *still* be modified so long as a less speech-restrictive alternative can be "effective" in addressing the Government's interests. *Playboy*, 529 U.S. at 824.

### 3. The Magistrate Judge Relied on Unfounded Assumptions Regarding the Risks of Notification.

Having concluded that the Government was entitled to an "assurance" of secrecy, and that an "absence .... of information" of the risks to its investigation was sufficient to carry the Government's First Amendment burden, the Magistrate Judge rejected Microsoft's proffered alternatives. *See* Order at 9-12. Yet her analysis of Microsoft's alternatives was based on a series of unfounded assumptions regarding the risks of notification. *See Playboy*, 529 U.S. at 824 ("A court should not assume a plausible, less restrictive alternative would be ineffective; and a court should not presume parents, given full information, will fail to act.").

*First*, the Magistrate Judge assumed that because "two employees used the Customer's e-mail accounts to facilitate the illegal activity" and "acted on behalf of the Customer, to its financial benefit," there was a "*possibility* that high-level employees at the Customer know of or condoned that activity." Order at 10 (emphasis added). Setting aside the Magistrate Judge's reliance on this speculative "possibility," it does not logically follow that a senior executive or director of a ▮▮▮-employee conglomerate (including one associated with an entirely separate business unit) might be involved in misconduct simply because two low-level employees took actions that served the Customer's financial interests.[18] All manner of corporate misconduct

---

[18]     In a related Fourth Amendment context, for example, the Government cannot obtain a "general or 'all records' warrant" to search a company's records unless it first establishes "probable cause to believe that [the] entire business is 'pervaded' or 'permeated' with fraud." *United States v. D'Amico*, 734 F. Supp. 2d 321, 360 (S.D.N.Y. 2010); *see also United States v. Zemlyansky*, 945 F. Supp. 2d 438, 460 (S.D.N.Y. 2013) (quotations omitted) (similar).

serves a corporation's financial interests without involvement by senior employees, such as a sales representative who lies to his customer or pays a bribe to procure a sale (and obtain a commission). Further, the stronger a company's compliance controls and policies, the weaker the assumption of high-level involvement. *See, e.g.*, U.S. Attorney's Manual, § 9-28.800, https://perma.cc/P3A6-98CQ (explaining that well-designed compliance programs discourage "employees to engage in misconduct to achieve business objectives"). Even in cases involving senior-level misconduct and foreign parties, corporate leadership is often entrusted to produce information responsive to a government investigation. *See, e.g.*, *United States v. Keppel Offshore & Marine Ltd*, 17-CR-697 (E.D.N.Y. Dec. 22, 2017) (FCPA deferred prosecution agreement involving corporate cooperation, including the production of documents), https://perma.cc/PG86-ZPX3. Here, given that the Customer is a large, publicly traded company with a mature governance and compliance structure, *see supra* 8-9, 16-17, the Magistrate Judge improperly assumed the need for complete silence merely because two low-level employees may have engaged in misconduct to benefit the Customer.

*Second*, the Magistrate Judge concluded that a protective order prohibiting disclosure beyond the notified employee would not effectively serve the Government's interest in secrecy because "both the Customer and its fully owned subsidiary are headquartered outside the United States, potentially placing them outside the contempt jurisdiction of the Court." Order at 11. But even if non-U.S. employees could not be brought within the contempt jurisdiction of the Court through a protective order (they can),[19] the Customer has in-house counsel and senior

---

[19]   *See, e.g.*, *SEC v. Homa*, 514 F.3d 661, 675 (7th Cir. 2008) (district court had personal jurisdiction over offshore bankers who were U.S. citizens but residents of a foreign country to hold them in contempt for violating an order to freeze assets); *Eli Lilly & Co. v. Gottstein*, 617 F.3d 186, 195-96 (2d Cir. 2010) (using same approach to uphold district court's exercise of specific jurisdiction over nonparty who violated a protective order). Further, the Government

executives based in the United States and subject to the Court's contempt jurisdiction, including
at least ▓▓ attorneys in the United States (including the general counsel for the Americas), ▓
senior executives based in the United States (including the president of the North America
region), and one board member based here. *Supra* 16-17. The Government has not articulated
any reason to believe *any* of these U.S.-based lawyers or executives have a plausible link to the
conduct under investigation. Accordingly, the DOJ could provide notice to a senior employee
conditioned on that employee being subject to this Court's jurisdiction to enforce contempt for
any confidentiality violation. At a *minimum*, the secrecy order could be modified to permit
Microsoft to notify one of these U.S.-based employees of the fact that a warrant was received,
which would empower the Customer to raise its concerns directly.

 *Third*, the Magistrate Judge wrongly concluded that "while the Customer's legal
department might provide candidates for notification, the General Counsel would have a
professional responsibility to advise its client of the Search Warrant, thus making it impossible to
maintain secrecy." Order at 11. In fact, the law is exactly the opposite of what the Magistrate
Judge suggests: in-house counsel would have both an ethical and a legal duty to abide by
whatever restraints on disclosure this Court may order.

 In the United States—where several of the Customer's attorneys are licensed, *see supra*
16, the law recognizes many circumstances in which an attorney not only has no duty to share
information with a client, but is *prohibited* from doing so. For example, civil litigants are
routinely subject to protective orders that permit discovery on an "attorneys' eyes only" basis,
*i.e.*, orders that prohibit attorneys from sharing with their clients any information designated by

---

here is asserting its jurisdiction to investigate conduct of two foreign-based employees of one
subsidiary of this multinational company, amply demonstrating its extraterritorial reach.

an opponent as "attorneys' eyes only." *See, e.g., In re Terrorist Bombings of U.S. Embassies in E. Africa*, 552 F. 3d 93, 127 (2d Cir. 2008) (upholding attorneys'-eyes-only protective order). Counsel have an affirmative ethical duty to abide by these sorts of restraints on disclosure. *See* ABA Model RPC § 3.4(c), https://perma.cc/CP4N-LVLU (a lawyer may not "knowingly disobey an obligation under the rules of a tribunal, except for an open refusal based on an assertion that no valid obligation exists"); *id.* § 1.4 Comment 7, https://perma.cc/BTN3-F39W ("[C]ourt orders governing litigation may provide that information supplied to a lawyer may not be disclosed to the client."); *Aging Backwards, LLC v. Esmonde-White*, 2016 WL 11523402, at *3 (S.D. Fla. Sept. 26, 2016) (citing cases rejecting challenges to attorneys'-eyes-only protective orders).[20] And many companies, including the Customer, have policies that require *all* in-house counsel to maintain the confidentiality of whistleblower complaints. *See supra* 16-17. In short, lawyers routinely abide by confidentiality obligations similar to what the Court could impose on in-house counsel here—because they are ethically obliged to do so.

Given the absence of any evidentiary support for the Magistrate Judge's analysis, the Magistrate Judge may have based her decision on facts set forth in the Government's affidavit submitted *ex parte* to support the warrant and the secrecy order but never made available to Microsoft. If so, restraining Microsoft's First Amendment rights without allowing it to see the evidence to support the restraint presents intractable due process concerns. "Freedom of speech and the other freedoms encompassed by the First Amendment always have been viewed as fundamental components of the liberty safeguarded by the Due Process Clause." *First Nat'l*

---

[20]     Even if there were a conflict between the contemplated protective order and the Customer's in-house counsels' professional responsibilities (there is not), the protective order would trump, as a court order supersedes any professional responsibilities an attorney has to her client. *See, e.g., Rhodes v. Pfeiffer*, 2017 WL 11048475, at *3 (C.D. Cal. Sept. 12, 2017) ("[T]he terms of the Protective Order concerning the return of confidential materials trump any contrary obligations arising under the Professional Rules of Conduct." (quotations omitted)).

24

*Bank of Bos. v. Bellotti*, 435 U.S. 765, 780 (1978). "One would be hard pressed to design a procedure more likely to result in erroneous deprivations" than the "use of classified information without disclosure" to the opposing party—a proposition that applies here *a fortiori*, where no classified national security secrets appear to be involved. *Al Haramain Islamic Found, Inc. v. U.S. Dep't of Treasury*, 686 F.3d 965, 980 (9th Cir. 2012). If presented with all facts the Government offered to support secrecy, Microsoft may well be able to refute them or explain why they have no bearing on the strict scrutiny analysis. Accordingly, Microsoft respectfully requests an opportunity to review promptly, subject to a protective order if necessary, any aspects of the *ex parte* affidavit relevant to the Court's consideration of Microsoft's motion, apart from those unsealed in the Magistrate Judge's decision.

On the record made available to Microsoft, however, the secrecy order cannot stand, as the Government has not overcome the "heavy presumption against [the] constitutional validity" of this prior restraint. *Nebraska Press Ass'n*, 427 U.S. at 558 (quotations omitted).

## CONCLUSION

For the reasons stated above, this Court should modify the secrecy order to allow Microsoft to notify an appropriate individual at the Customer about the warrant.

25

Dated: September 13, 2019

Respectfully submitted,

*Nancy Kestenbaum* / H

Nancy Kestenbaum EDNY Bar # NK9768

Jordan Joachim EDNY Bar # JJ5171
COVINGTON & BURLING LLP
The New York Times Building
620 Eighth Avenue
New York, NY 10018-1405
Tel: 212-841-1000
Fax: 212-841-1010
nkestenbaum@cov.com
jjoachim@cov.com

James M. Garland*
Alexander A. Berengaut*
Megan A. Crowley**
Lauren K. Moxley**
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001
United States of America
Tel: 202-662-6000
Fax: 202-662-6291
jgarland@cov.com
aberengaut@cov.com
mcrowley@cov.com
lmoxley@cov.com

Stephen M. Rummage**
Ambika K. Doran**
DAVIS WRIGHT TREMAINE LLP
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
Tel: 206-662-3150
Fax: 206-757-7700
steverummage@dwt.com
ambikadoran@dwt.com

*Admitted *pro hac vice*
**Applications for admission *pro hac vice*
pending

*Counsel for Microsoft Corporation*

26

# Appendix A

*Filed Under Seal*